TRACY L. WILKISON
United States Attorney
SCOTT M. GARRINGER
Assistant United States Attorney
Chief, Criminal Division
JONATHAN GALATZAN
Assistant United States Attorney
Chief, Asset Forfeiture Section
KATHARINE SCHONBACHLER
Assistant United States Attorney
Asset Forfeiture Section
California Bar No. 222875
    Federal Courthouse, 14th Floor
    312 North Spring Street
    Los Angeles, California 90012
    Telephone: (213) 894-3172
    Facsimile: (213) 894-0142
    E-mail: Katie.Schonbachler@usdoj.gov

Attorneys for Plaintiff
United States of America

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>$63,353.86 IN BANK FUNDS,<br><br>Defendant. | No. 2:22-cv-04423<br><br>**VERIFIED COMPLAINT FOR FORFEITURE**<br><br>18 U.S.C. §§ 981(a)(1)(A) and (C) and 984<br><br>[F.B.I.] |

Plaintiff United States of America brings this claim against defendant $63,353.86 in Bank Funds (the "defendant bank funds"), and alleges as follows:

## JURISDICTION AND VENUE

1. The government brings this in rem civil forfeiture action pursuant to 18 U.S.C. §§ 981(a)(1)(A) and (C) and 984.

2. This Court has jurisdiction over the matter pursuant to 28 U.S.C. §§

1

1345 and 1355.

3. Venue lies in this district pursuant to 28 U.S.C. § 1395(b).

## PERSONS AND ENTITIES

4. The plaintiff in this action is the United States of America.

5. The defendant in this action is $63,353.86 in Bank Funds, seized pursuant to a federal seizure warrant on November 20, 2017 from a Comerica Bank account with the last four digits of 8506. The defendant bank funds were held in the name of Oneworld Financial Holding Group Co Ltd and were seized at Comerica Bank located at 13200 Crossroads Parkway North, Suite 100, City of Industry, California.

6. The defendant bank funds are currently in the custody of the United States Marshals Service in this District, where they shall remain subject to this Court's jurisdiction during the pendency of this action.

7. The interests of Oneworld Financial Holding Group Co Ltd ("Oneworld") and Zhili Song, aka Ethan Song, may be adversely affected by these proceedings.

## FACTS SUPPORTING FORFEITURE

*Background of Investigation*

8. The Federal Bureau of Investigation ("FBI") conducted an investigation of activity that included illegal money transmitting, mail fraud, wire fraud, money laundering and cyber- and technology-enabled crimes, including romance scams and business email compromise ("BEC") scams. Among the money laundering methods detected was the practice of laundering proceeds through illegal money transmitting known as an Informal Value Transfer System ("IVTS")[1]. An IVTS provides security,

---

[1] According to a Financial Crimes Enforcement Network ("FinCEN") Advisory (Issue 33, March 2003), an "informal value transfer system" refers to any system, mechanism, or network of people that receives money for the purpose of making the funds or an equivalent value payable to a third party in another geographic location, whether or not in the same form. The transfers generally take place outside of the conventional banking system through non-bank financial institutions or other business entities whose primary business activity may not be the transmission of money. The

*(footnote cont'd on next page)*

anonymity, and versatility to users, and is attractive to criminals due to its cost effectiveness, efficiency, reliability, lack of bureaucracy, lack of paper trail and ability to avoid scrutiny from taxing authorities and law enforcement.

9. Beginning no later than May 9, 2017, and continuing to at least November 1, 2017, accounts held in the names of Dianwei Wang ("Wang"), Zhili Song ("Song") and their associated businesses, including Song's Oneworld (collectively, the "Subject Accounts"), received funds from numerous third-parties, which funds were traceable to victims of romance scams and other social engineering schemes perpetrated against U.S. and foreign victims, or were retransmitted by money mules involved in the scams.

*Romance Scams*

10. A romance scam, also known as "confidence scam," occurs when a person deceives a victim into believing they have a trust relationship—whether familial, friendly, or romantic—and leverages the relationship to persuade the victim to send money, provide personal and financial information, or purchase items of value for the violator. Violators often use online dating sites to pose as U.S. citizens located in a foreign country, U.S. military members deployed overseas, or U.S. business owners seeking assistance with lucrative investments. In some cases, the victim is persuaded to launder money on behalf of the violator.

11. Victims of romance scams often do not recognize that they are being defrauded for many months or more, and sometimes never recognize that they have been defrauded, because they are, or believe they are, in love with the person making the false romantic overtures or promises to them. Therefore, it is not uncommon to observe multiple wires and transfers being sent to the same beneficiary or multiple beneficiaries

---

IVTS transactions occasionally interconnect with formal banking systems (for example, through the use of bank accounts held by the IVTS operator). Contemporary IVTS operations often involve the use of traditional financial institutions to complete the process. Depending on the ethnic group, IVTS are called by a variety of names including, for example, "hawala" (Middle East); "fei ch'ien" (China); and "Black Market Peso Exchange" (Latin America).

over a period of time. Some victims of romance scams are not completely truthful with, or seek to impede law enforcement officers who question them about the money they have transferred, in part to protect their purported romantic partner or friend. Some victims of romance scams become "mules" by agreeing to receive and retransfer funds that are the proceeds of other frauds at the instruction of their supposed romantic partner.

*BEC Scams*

12. A business email compromise (BEC) scam, also known as "CEO Fraud," is a sophisticated fraud scheme that targets businesses and organizations by inducing employees with access to the targeted organization's payment systems to make wire transfers to bank accounts falsely represented to be those of a trusted business party, except the account is actually controlled by the fraudsters.

*Illegal Money Transmitting and Money Service Businesses*

13. 31 C.F.R. § 1010.100(ff) defines a money services business ("MSB") as a "person, wherever located, doing business, whether or not on a regular basis or as an organized or licensed business concern, wholly or in substantial part within the United States, in one or more of the capacities listed in paragraphs (ff)(1) through (ff)(7) of this section." Pursuant to Section 1010.100(ff)(5), the definition of MSB includes persons who provide "money transmission services," further defined as "the acceptance of currency, funds, or other value that substitutes for currency from one person and the transmission of currency, funds, or other value that substitutes for currency to another location or person by any means. 'Any means' includes, but is not limited to, . . . an informal value transfer system . . . ."

14. Pursuant to 18 U.S.C. § 1960(b)(1)(A), an unlicensed money services business is one that "is operated without an appropriate money transmitting license in a State where such operation is punishable as a misdemeanor under State law, whether or not the business operator knew that the operation was required to be licensed," or fails to comply with federal regulations requiring registration of such businesses.

15. The MSB registration requirement is found at 18 U.S.C. §§ 1960(a) and

(b)(1)(B), which make it a crime to conduct similar activities or own such a business without registering with the FinCEN.  Specifically, 31 C.F.R. § 1022.380(a) generally requires each MSB (whether or not licensed as a money service business by any State) to register with FinCEN.

16. In California, money transmitters are also required to be licensed. Cal. Fin. Code § 2000, et seq.  The Department of Business Oversight is the California state agency responsible for issuing licenses for businesses who desire to operate as money transmitting businesses in California.  The California Department of Business Oversight Directory of Money Transmitters records do not reflect Wang, Song, Ji or Oneworld as licensed money transmitting businesses in the state of California.  Similarly, FinCEN MSB Registrant records do not reflect Wang, Song, Ji or Oneworld registered as a money transmitting businesses, meaning they did not comply with federal regulations regarding the registration of money transmitting businesses were not at any relevant time registered with the Financial Crimes Enforcement Network, as required by 31 U.S.C. § 5330, and were not licensed in the state of California.

17. MSBs are not only required to be licensed and registered, but must comply with Bank Secrecy Act anti-money laundering regulations, such as filing required Form 8300 Reports of Cash Payments Over $10,000 Received in a Trade or Business, which identifies persons involved in large currency transactions.  In addition, MSBs must file FinCEN Form 104 (CTR) for each deposit, withdrawal, exchange of currency, or other payment or transfer, by, through, or to the MSB that involves more than $10,000 in currency.  Multiple transactions must be treated as a single transaction if the MSB has knowledge that (1) they are by or on behalf of the same person; and (2) they result in more than $10,000 in currency either having been received (Cash In) or disbursed (Cash Out) during any one business day.  MSBs who are not licensed or registered tend not to adhere to such anti-money laundering laws and regulations.

*Illegal Proceeds Deposited into the Oneworld Account*

18. On or about June 1, 2017, an account was opened at Comerica Bank in the

name of Oneworld Financial Holding Group ("Oneworld Account") with a $1,000 cash deposit. The authorized signatory was Song, who opened the Oneworld Account in person at the Comerica branch located at 13200 Crossroads Pkwy North, La Puente, CA, in Los Angeles County. At the time of account opening, Song produced an Illinois driver's license.

19. California Secretary of State records for Oneworld reflect that the Articles of Incorporation were filed on March 20, 2017 with Song listed as the agent for service of process at a residential address in West Covina, and the Statement of Information was filed on June 19, 2020 with Song listed as CEO, Secretary, CFO and Director. No other individuals were listed.

20. Between June 2 and August 7, 2017, the Oneworld Account received 19 wire transfers totaling approximately $900,000. On November 20, 2017, the balance in the account was $63,353.86 (*i.e.*, defendant bank funds) which the FBI seized pursuant to a federal seizure warrant.

21. Based on law enforcement's review of bank records and interviews of depositors and bank investigators, the majority (approximately $498,850) of the funds deposited into the Oneworld Account were fraudulently obtained from victims of romance scams, BEC scams, and other social engineering schemes perpetrated against numerous U.S. and foreign victims, and the Oneworld Account was being used to both launder fraud proceeds and operate an illegal MSB. Below is a summary of some of the interviews.

*Funds from J.K.*

22. On or about July 11, 2017, the Oneworld Account received an incoming wire of $32,200 from a Union Bank account ("J.K. Account"), held jointly in the names of J.K. and her son. J.K resides in West Los Angeles, California.

23. J.K. stated that she fell victim to a romance scam and has sent multiple wire transfers, totaling over $153,900, to multiple individuals.

24. In June 2017, J.K. met a person who identified himself as David Edwardo

Hicks ("Hicks") on Match.com, a dating website. Hicks provided J.K. with his private email address and J.K. and Hicks started communicating through email. J.K. stated that Hicks was "romantic but possessive" in his emails to her, and even referred to J.K. as his fiancé. Hicks told J.K. that he was a colonel in the U.S. Army stationed in Afghanistan. Hicks first asked J.K. to send him $4,710 to purchase a satellite phone. J.K. ordered a bank wire transfer for $4,710 from J.K.'s account at Chase Bank to a Bank of Texas account, on Hicks' instructions.

25. Hicks then asked J.K. to pay for his leave from military duties so he could visit J.K. in person, by transferring $32,200 into the Oneworld Account. Hicks stated that Oneworld was a diplomatic agency, and Hicks would be granted leave upon transfer of the funds.

26. On or about July 11, 2017, J.K. went to a Union Bank branch located in Marina Del Rey, California, and authorized a wire transfer of $32,200 from the J.K. Account to the Oneworld Account, for the benefit of Oneworld. After J.K. wired the money, Hicks advised that he would not be able to take the flight to the U.S. due to a paperwork delay.

27. Hicks subsequently made two additional wire requests of J.K. in connection with Hicks' purported leave request. As instructed, J.K. sent two additional wires, in the respective amounts of $67,100 and $54,600, from the J.K. Account to a Bank of America account ending in 1458. After J.K. sent the wires, Hicks advised that his travel was delayed again.

*Funds from D.T.*

28. D.T. was a victim of an online romance scam. D.T. met her "boyfriend" on the internet, never in person. D.T. told a FirstBank of Nebraska ("FirstBank") investigator that her online boyfriend was working on a pipeline in South Africa. FirstBank reported that D.T. was initiating suspicious wire transfers to multiple third-party beneficiaries, including a Bank of America account ending in 7795 ("BofA Account 7795").

29. On or about July 10, 2017, $7,400 was wire transferred from D.T.'s FirstBank account to the Oneworld Account. On or about July 12, 2017, D.T. took out an $8,000 loan from Countryside Bank and, on the following day, D.T. requested that $7,500 be wire transferred from D.T. Countryside Account to the Oneworld Account. Ultimately, the $7,500 wire was not credited to the Oneworld Account. On or about July 20, 2017, D.T. requested a wire transfer of $50,000 to be deposited into a Bank of America account. When the wire request was rejected due to incorrect wire information, D.T. provided Countryside with the Oneworld Account to wire the $50,000 to, and $50,000 was successfully wired to the Oneworld Account from the D.T. Countryside Account.

30. On or about July 25, 2017, at her online boyfriend's request, D.T. requested a wire transfer in the amount of $60,000 be sent to a Cathay Account held in the name of Xue Ji (Ji's Cathay Account). Bank records reflect that the $60,000 was successfully wired into Ji's Cathay Account from the D.T. Account.

*Xue Ji's Subject Accounts*

31. During this ongoing investigation, investigators learned that Xue Ji ("Ji") had at least two bank accounts that received significant proceeds from Wang and Song traceable to fraud victims.

32. On or about August 2, 2017, Ji's HSBC Account was opened by Ji in her own name. On the same day, $120,000 was transferred from an HSBC Account ending in 2608, held in the name of Wang ("Wang's HSBC Account"), to Ji's HSBC Account. No other deposit or withdrawal activity is reflected in records for Ji's HSBC Account. In other words, Ji's HSBC Account was funded entirely by monies transferred from Wang's HSBC Account.

33. On or about May 22, 2017, Ji's Cathay Account was opened with a deposit of $555. There was no further substantial activity in the account until July 25, 2017, when D.T. incoming $60,000 wire was deposited into the account. When a Countryside employee told D.T. they were looking out so that D.T. was not getting scammed, D.T.

said the funds were being wired to Ji for an investment. In an interview with the FBI, Ji said she did not know D.T. and did not know why D.T. wired funds to Ji's Cathay Account.

*Song Falsely Stated to FBI Agents That He and Ji Were Buying a House Together*

34. On or about July 26, 2017 and August 3, 2017, Ji's Cathay Account received incoming wires from the Oneworld Account in the amounts of $40,000 and $60,000, respectively.

35. On December 13, 2017, FBI agents and a Chinese interpreter, interviewed Song and below is a summary of the interview, in substance and in part.

36. Song stated he had invested in bitcoins in China. The wires into the Subject Accounts were from the sale of bitcoins he had arranged to sell through Wang. For example, Song stated the wires from J.K. and D.T. were proceeds from the sale of bitcoins.

37. Song stated that he wired funds to Ji's Cathay Bank account from the Oneworld Account to purchase a house together as an investment. Song was lending money to Ji. Song stated Wang was also investing in the same house with Ji and Song.

*Statements Made by Ji*

38. On December 13, 2017, FBI agents and a Chinese interpreter, interviewed Ji. On or about April 5, 2018, Ji also provided a sworn affidavit regarding Ji's HSBC Account. Below is a summary of Ji's statements, in substance and in part.

39. Ji admitted that she was an IVTS customer.

40. Ji reported that she is a Chinese citizen attending a Southern California university and is unemployed. Ji reported that she is married to another Chinese citizen who is also a student.

41. Ji admitted that she hired Song to facilitate money transfers from her family in China to her in the United States, by means other than legal international bank transfers, in order to circumvent the Chinese regulations that limits Chinese citizens to exporting from China a maximum total annual quota equivalent to USD $50,000 per

person each year. Song instructed Ji to have her family in China transfer funds into Song's Hong Kong based bank accounts, after which Song would arrange for the money to get to Ji in the U.S. with the expectation that Ji would receive the approximate equivalent funds in the U.S., minus a fee.

42. Ji admitted that she opened both Ji's HSBC Account and Ji's Cathay Account, and that the funds deposited into the accounts were the results of her arrangement with Song.

43. Agents showed Ji a list of transactions in Ji's Cathay Account totaling $214,000 in incoming wire transfers and cash deposits, including the July 25, 2017 $60,000 wire transfer from victim D.T. Ji indicated that all the deposits and wires into Ji's Cathay Account constituted funds her parents in China were attempting to send to Ji for the purpose of purchasing a house in the United States. Ji stated she did not know the individual remitters who wired money to her accounts, or the reason why they were wiring the funds to her accounts.

44. During the interview, Ji received a telephone call from Wang. Wang called Ji to tell her that the FBI may be coming to speak with her and he asked her to confirm that they were buying a house in partnership with him. When Ji asked why she would lie to the FBI, Wang explained that the transactions into Ji's account may be considered money laundering.

45. During the interview, Ji placed a telephone call to Song. Song told Ji to tell the FBI that the money in Ji's HSBC Account was for the purchase of a house in partnership with Wang. Song also instructed Ji to tell the FBI that Ji's Cathay Account transactions were for the purchase of another property.

46. Ji denied she was purchasing a house with Wang. Ji stated Wang lied to the FBI about purchasing a property with Ji.

*Related Criminal Matter*

47. On August 30, 2018, a grand jury in the Central District of California returned an Indictment in *United States of America v. Dianwei Wang and Zhili Song aka*

*Ethan Song*, 2:18-cr-00559-SVW, charging Wang and Song with conspiracy to obstruct justice and witness tampering, which alleges, inter alia, that they conspired to convince Ji to lie to the FBI.  This indictment was under seal until on January 12, 2022, when a First Superseding Indictment was returned by a grand jury in the Central District of California against Song and Wang for violations of 18 U.S.C. § 371 (Conspiracy to Operate an Unlicensed Money Service Business); 18 U.S.C. § 1512(k) Conspiracy to Obstruct Justice (Witness Tampering); and 18 U.S.C. § 1512(b)(3) (Witness Tampering).  Wang and Song remain fugitives.

## FIRST CLAIM FOR RELIEF

48.     Based on the above, plaintiff United States of America alleges that the defendant bank funds constitute or are derived from proceeds traceable to violations of 18 U.S.C. §§ 1341 (mail fraud), and/or 1343 (wire fraud), which are specified unlawful activities as defined in 18 U.S.C. §§ 1956(c)(7)(A) and 1961(1)(B).  The defendant bank funds are therefore subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C).  To the extent that the defendant bank funds are not the actual monies directly traceable to the illegal activity identified herein, plaintiff alleges that the defendant bank funds are identical property found in the same account or place as the property involved in the specified offense, rendering the defendant bank funds subject to forfeiture pursuant to 18 U.S.C. § 984.

## SECOND CLAIM FOR RELIEF

49.     Based on the above, plaintiff United States of America further alleges that the defendant bank funds constitute property involved in multiple transactions or attempted transactions in violation of 18 U.S.C. §§ 1956(a)(1)(A)(i) and/or and (a)(1)(B)(i), or property traceable to such property, with the specified unlawful activity being violations of 18 U.S.C. §§ 1341 (mail fraud) and/or 1343 (wire fraud).  The defendant bank funds are therefore subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A).  To the extent that the defendant funds are not the actual monies or assets directly traceable to the illegal activity identified herein, plaintiff alleges that the

defendant funds are identical property found in the same account or place as the property involved in the specified offense, rendering the defendant funds subject to forfeiture pursuant to 18 U.S.C. § 984.

## THIRD CLAIM OF RELIEF

50. Based on the above, plaintiff United States of America further alleges that the defendant bank funds were involved in transactions or attempted transactions in violation of 18 U.S.C. § 1960. The defendant bank funds are therefore subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A). To the extent that the defendant funds are not the actual monies or assets directly traceable to the illegal activity identified herein, plaintiff alleges that the defendant funds are identical property found in the same account or place as the property involved in the specified offense, rendering the defendant funds subject to forfeiture pursuant to 18 U.S.C. § 984.

WHEREFORE, plaintiff United States of America prays that:

(a) due process issue to enforce the forfeiture of the defendant bank funds;

(b) due notice be given to all interested parties to appear and show cause why forfeiture should not be decreed;

(c) this Court decree forfeiture of the defendant bank funds to the United States of America for disposition according to law; and

///

(d) for such other and further relief as this Court may deem just and proper, together with the costs and disbursements of this action.

Dated: June 28, 2022

TRACY L. WILKISON
United States Attorney
SCOTT M. GARRINGER
Assistant United States Attorney
Chief, Criminal Division
JONATHAN GALATZAN
Assistant United States Attorney
Chief, Asset Forfeiture Section

/s/*Katharine Schonbachler*
KATHARINE SCHONBACHLER
Assistant United States Attorney

Attorneys for Plaintiff
United States of America

**VERIFICATION**

I, Lance Kim, hereby declare that:

1. I am a Special Agent with the Federal Bureau of Investigation and am the case agent for the forfeiture matter entitled <u>United States of America v. $63,353.86 in Bank Funds</u>.

2. I have read the above Verified Complaint for Forfeiture and know its contents. It is based upon my own personal knowledge and reports provided to me by other law enforcement agents.

3. Everything contained in the Complaint is true and correct, to the best of my knowledge and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Executed June 28, 2022, in Los Angeles, California.

*/s/ Lance Kim*

Lance Kim